# United States Court of Appeals for the Fourth Circuit

---

PLANNED PARENTHOOD SOUTH ATLANTIC; GREENVILLE WOMEN'S CLINIC;
TERRY L. BUFFKIN,
PLAINTIFFS-APPELLEES,

*v.*

ALAN WILSON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF SOUTH CAROLINA;
WILLIAM WALTER WILKINS III, IN HIS OFFICIAL CAPACITY AS SOLICITOR FOR SOUTH
CAROLINA'S 13TH JUDICIAL CIRCUIT,
DEFENDANTS-APPELLANTS,
*AND*
HENRY MCMASTER, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF SOUTH
CAROLINA; JAMES H. LUCAS, IN HIS OFFICIAL CAPACITY AS SPEAKER OF THE
SOUTH CAROLINA HOUSE OF REPRESENTATIVES,
INTERVENORS-APPELLANTS,
*AND*
ANNE G. COOK, ET AL., DEFENDANTS.

---

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA,
NO. 21-CV-00508, HON. MARY GEIGER LEWIS, PRESIDING*

---

## BRIEF FOR APPELLANTS

---

THOMAS A. LIMEHOUSE, JR.
WM. GRAYSON LAMBERT
*Office of the Governor*
*South Carolina State House*
*1100 Gervais Street*
*Columbia, South Carolina 29201*
*(803) 734-2100*

CHRISTOPHER MILLS
*Spero Law LLC*
*1050 Johnnie Dodds Blvd. #83*
*Mt. Pleasant, SC 29465*
*(843) 606-0640*
*cmills@spero.law*

*Counsel for Governor McMaster*

[ADDITIONAL COUNSEL LISTED ON INSIDE COVER]

ALAN WILSON
ROBERT D. COOK
J. EMORY SMITH, JR.
*Office of the Attorney General*
*P.O. Box 11549*
*Columbia, South Carolina 29211*
*(803) 734-3677*

*Counsel for Attorney General*
*Wilson and Solicitor Wilkins*

KEVIN A. HALL
M. TODD CARROLL
*Womble Bond Dickinson (US) LLP*
*1221 Main Street, Suite 1600*
*Columbia, South Carolina 29201*
*(803) 454-6504*

*Counsel for Speaker Lucas*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ........................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................ 4

STATEMENT OF ISSUES .............................................................................. 5

STATEMENT OF THE CASE.......................................................................... 5

      A.    South Carolina's preexisting regulation of abortion................. 5

      B.    The Act ................................................................................ 6

      C.    Parties and proceedings below.............................................. 10

STANDARD OF REVIEW ............................................................................ 13

SUMMARY OF ARGUMENT ...................................................................... 14

ARGUMENT ................................................................................................ 16

    I.    The Abortion Centers lack third-party constitutional standing........... 16

      A.    The Abortion Centers did not demonstrate or even allege the factual predicates for third-party standing. ........................ 18

      B.    The Abortion Centers do not have automatic third-party standing. ............................................................................... 25

    II.    The Abortion Centers lack statutory standing..................................... 30

      A.    Section 1983 limits claims to the person deprived of rights........................................................................................ 31

      B.    Courts and scholars agree that § 1983 does not provide a cause of action for third parties.................................................. 32

      C.    The Supreme Court's discussions of § 1983 are predicated on this interpretation. ............................................. 36

      D.    Under this settled interpretation of § 1983, the Abortion Centers do not have a valid cause of action............................. 38

    III.    The district court erred in enjoining the entire Act............................. 39

      A.    The Abortion Centers did not and cannot show a clear likelihood of success in attacking the entire Act. ..................... 40

1.    The Act's severability clause requires that every
      "word" not invalidated take effect....................................41

2.    U.S. Supreme Court precedent requires severance
      of any provision invalidated here. ..................................45

3.    The district court erroneously imposed its own
      views of the Act's purposes...........................................46

B.    The Abortion Centers did not satisfy the other injunction
      requirements regarding the Act's unchallenged
      provisions. ................................................................................51

CONCLUSION .........................................................................................52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

STATUTORY PROVISIONS

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advantage Media, LLC v. City of Eden Prairie*, 456 F.3d 793 (8th Cir. 2006) ......34

*Am. Libr. Ass'n v. Odom*, 818 F.2d 81 (D.C. Cir. 1987) .........................................23

*Ameur v. Gates*, 759 F.3d 317 (4th Cir. 2014)................................................. 40, 50

*Andrews v. Neer*, 253 F.3d 1052 (8th Cir. 2001).....................................................31

*Archuleta v. McShan*, 897 F.2d 495 (10th Cir. 1990)....................................... 30, 34

*Assa'd-Faltas v. Weiss*, 2015 WL 4487759 (D.S.C. July 23, 2015), *aff'd*, 639 F.
    App'x 181 (4th Cir. 2016) ......................................................................................33

*Austin v. Paramount Parks, Inc.*, 195 F.3d 715 (4th Cir. 1999)..............................37

*Barber v. Overton*, 496 F.3d 449 (6th Cir. 2007) ....................................................33

*Barker v. Halliburton Co.*, 645 F.3d 297 (5th Cir. 2011).........................................34

*Bishop v. Bartlett*, 575 F.3d 419 (4th Cir. 2009) .....................................................16

*Brossart v. Janke*, 859 F.3d 616 (8th Cir. 2017) .....................................................34

*Cap. Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984) ............................................23

*CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46 (4th Cir. 2011)................30

*Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000) ...................................... 33, 35

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507
    (2019)....................................................................................................................31

*Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986) .................................................34

*Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421 (4th Cir.
    2007)............................................................................................................... 42, 51

*CPC Int'l, Inc. v. Skippy Inc.*, 214 F.3d 456 (4th Cir. 2000)............................ 41, 52

*Di Biase v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017) ...................................... 13, 51

*Dohaish v. Tooley*, 670 F.2d 934 (10th Cir. 1982)..................................................34

*Edwards v. Beck*, 8 F. Supp. 3d 1091 (E.D. Ark. 2014), *aff'd*, 786 F.3d 1113 (8th
    Cir. 2015)..............................................................................................................46

*Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004) .................... 16–17, 20

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421 (6th Cir. 2019) ......................................................................................... 47, 52

*English v. Powell*, 592 F.2d 727 (4th Cir. 1979) .................................... 33

*Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041 (11th Cir. 2011) ....................................................................................... 34

*Felder v. Casey*, 487 U.S. 131 (1988)................................................... 37

*Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir. 2002) ...................................................... 17, 20, 22, 26–27

*Friedman v. Harold*, 638 F.2d 262 (1st Cir. 1981).................................. 23

*Garrett v. Clarke*, 147 F.3d 745 (8th Cir. 1998).................................... 33

*Gonzales v. Carhart*, 550 U.S. 124 (2007) .................................. 7, 21, 48

*Greenville Women's Clinic v. Bryant*, 222 F.3d 157 (4th Cir. 2000) ...................................................... 6, 22, 25, 44, 50

*Greenville Women's Clinic v. S.C. DHEC*, 317 F.3d 357 (4th Cir. 2002) ............... 6

*H.L. v. Matheson*, 450 U.S. 398 (1981) ................................................ 20

*Harris v. McRae*, 448 U.S. 297 (1980) ................................................. 20

*Hodak v. City of St. Peters*, 535 F.3d 899 (8th Cir. 2008)...................... 20

*Hodges v. Rainey*, 533 S.E.2d 578 (S.C. 2000) ................................. 38, 43

*Hodgson v. Minnesota*, 497 U.S. 417 (1990).......................................... 20

*Howerton v. Fletcher*, 213 F.3d 171 (4th Cir. 2000).................... 30, 32, 39

*In re DNA Ex Post Facto Issues*, 561 F.3d 294 (4th Cir. 2009) ................. 41–42, 47

*Inmates v. Owens*, 561 F.2d 560 (4th Cir. 1977)................................... 33

*Inyo County v. Paiute-Shoshone Indians*, 538 U.S. 701 (2003) .............. 37

*Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265 (5th Cir. 2019)........ 12

*Jaco v. Bloechle*, 739 F.2d 239 (6th Cir. 1984)..................................... 33

*Joytime Distribs. & Amusement Co. v. South Carolina*, 528 S.E.2d 647 (S.C. 1999)......................................................... 41–43, 48

*June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103 (2020)............ 24, 26–27

iv

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ........................................... 16–17, 19–20

*Leavitt v. Jane L.*, 518 U.S. 137 (1996) ................................................. 20, 45–47, 50

*Lee v. Boeing Co.*, 123 F.3d 801 (4th Cir. 1997)......................................32

*Lewis v. Casey*, 518 U.S. 343 (1996)......................................................27

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118
   (2014).............................................................................................. 17, 30

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .............................16

*Maher v. Roe*, 432 U.S. 464 (1977) ........................................................20

*Marks v. United States*, 430 U.S. 188 (1977) .........................................28

*Maryland v. King*, 567 U.S. 1301 (2012) ...............................................52

*McCorvey v. Hill*, 385 F.3d 846 (5th Cir. 2004)......................................19

*McKelvie v. Cooper*, 190 F.3d 58 (2d Cir. 1999) ....................................34

*Miller's Apple Valley Chevrolet Olds-Geo, Inc. v. Goodwin*, 177 F.3d 232 (4th Cir.
   1999)......................................................................................................31

*Mitchell v. Cannon*, 2009 WL 824202 (D.S.C. Mar. 26, 2009), *aff'd*, 367 F. App'x
   390 (4th Cir. 2010) ..............................................................................33

*MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768 (8th Cir. 2015) .............46

*N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016).................40

*N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020) .... 14, 25

*Nielsen v. Preap*, 139 S. Ct. 954 (2019) .................................................31

*Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895 (9th Cir. 2007).......34

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013).......................................14

*Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176 (4th Cir. 2009)...........37

*Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004)...................40

*Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908 (6th Cir. 2019)....38

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833
   (1992)........................................................ 2, 12, 21, 24, 38, 44, 47, 52

*Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786 (7th Cir.
   2013) ................................................................................... 29, 48

v

*Poelker v. Doe*, 432 U.S. 519 (1977)........................................................20

*Powell v. Ohio*, 499 U.S. 400 (1991)........................................................17

*Prince v. Massachusetts*, 321 U.S. 158 (1944).........................................16

*Rizzo v. Goode*, 423 U.S. 362 (1976)........................................................36

*Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984)...................22

*Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017)................................35

*Settle v. Slager*, 2015 WL 12865194 (D.S.C. May 20, 2015), *aff'd*, 628 F. App'x 206 (4th Cir. 2016) ..............................................................................33

*Singleton v. Wulff*, 428 U.S. 106 (1976) ............................................. 19, 26–28

*Smith v. Tiffany*, 799 S.E.2d 479 (S.C. 2017) .................................... 43, 49

*Stone v. Traynham*, 297 S.E.2d 420 (S.C. 1982) .........................................41

*Texas Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012)..............................................................................................48

*United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021) ...............................40

*United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952) .................38

*United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020) ...............................40

*United States v. Norman*, 935 F.3d 232 (4th Cir. 2019).............................39

*United States v. Under Seal*, 819 F.3d 715 (4th Cir. 2016)........................49

*United States v. Under Seal*, 853 F.3d 706 (4th Cir. 2017)........................17

*Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599 (4th Cir. 2009)................37

*Warth v. Seldin*, 422 U.S. 490 (1975) .......................................... 16–17, 26

*Williams v. Zbaraz*, 448 U.S. 358 (1980) ...............................................20

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)........................13

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)................................................36

## CONSTITUTIONAL PROVISIONS

S.C. Const. art. IV, § 15 .........................................................................49

**STATUTES**

28 U.S.C. § 1292 ...................................................................4

28 U.S.C. § 1331 ...................................................................4

28 U.S.C. § 1343 ...................................................................4

42 U.S.C. § 1983 ........................................ 4–5, 11–12, 15, 30–39

S.C. Code Ann. § 44-41-10 *et seq.* ....................................5–6

S.C. Code Ann. § 44-41-330(A)(1) ...................................9

S.C. Code Ann. § 44-41-460(A) .........................................9

S.C. Code Ann. § 44-41-60.............................................6, 9

S.C. Code Ann. § 44-41-630 ........................................ 8, 43

S.C. Code Ann. § 44-41-640 ...............................................8

S.C. Code Ann. § 44-41-650 ...............................................8

S.C. Code Ann. § 44-41-680 ..................................... 10, 43

S.C. Code Ann. § 44-41-730 ...............................................9

S.C. Code Ann. § 44-41-740 ........................................ 9, 22

S.C. Code Ann. § 44-43-460 ...............................................7

S.C. Code Ann. § 62-1-507................................................7

South Carolina Fetal Heartbeat and Protection from Abortion Act, 2021 S.C. Acts No. 1 .......................................... 6–10, 21–22, 42, 47, 49

**RULES**

Fed. R. Civ. P. 52 ...............................................................51

**REGULATIONS**

S.C. Code Ann. Regs. 61-12.301 (2021) ......................... 6, 48

**OTHER AUTHORITIES**

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41 ...................35

*Hearings on S. 1 Before the S.C. Senate Medical Affairs Subcomm.*, 124th Sess. (Jan. 14, 2021) ....................................................................................21

1 Sheldon H. Nahmod, *Civil Rights & Civil Liberties Litigation: The Law of Section 1983* (4th ed. 2020)..................................................................36

William Theis, Shaw v. Garrison*: Some Observations on 42 U.S.C. § 1988 and Federal Common Law*, 36 La. L. Rev. 681 (1976) ............................................36

# INTRODUCTION

This appeal involves the limited power of federal courts to enjoin enforcement of state law. This power is narrowly circumscribed by both the Constitution and statute, and it may not be exercised to a greater extent than strictly necessary to resolve a particular case. These strictures are especially important in the context of a preliminary injunction, when a federal court acts on limited information without the benefit of full factual and legal development.

The district court here, however, preliminarily enjoined the entirety of a state law that is largely unchallenged and that requires any invalidated portion—even as little as a "word"—to be severed. And the court did so on behalf of plaintiffs who do not even allege that the single challenged provision violates their own constitutional rights. Even worse, the injunction and plaintiffs' requested relief deprive the women whose rights they purport to assert of relevant information, choices, and the ability to vindicate rights in court *against the plaintiffs themselves*. Because no precedent sanctions such overreaching federal power to interfere with state law, especially in a case where the plaintiffs have neither constitutional nor statutory standing, the district court's injunction should be reversed.

Through several means, the South Carolina Fetal Heartbeat and Protection from Abortion Act advances South Carolina's "legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the" unborn

child. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992). The Act requires the abortionist to give the mother the opportunity to view an ultrasound, hear the child's heartbeat, and receive information about her child. If the abortionist fails to do any of these, the Act gives the mother a cause of action against him. The Act therefore reflects the reality "that most women considering an abortion would deem the impact on the fetus relevant, if not dispositive, to the decision." *Id.* at 882. "In attempting to ensure that a woman apprehend the full consequences of her decision, the State furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." *Id.*

The plaintiffs—three abortion clinics and one of their owners (collectively, the "Abortion Centers")—filed this lawsuit before Governor McMaster even signed the Act into law. They directly challenge only the provision of the Act that makes it unlawful in certain circumstances for the abortionist to terminate an unborn child with a beating heart, yet they nevertheless demand that the entire Act be enjoined. The district court obliged, imposing a temporary restraining order against the entire Act for nearly a month during which it lacked Article III jurisdiction over the challenge to proposed legislation. After the Abortion Centers finally amended their complaint, the court quickly issued a preliminary injunction against the whole Act.

Yet the Act contains a robust severability clause requiring that as little as a "word" that is invalidated be severed from the remaining provisions. And South Carolina law requires that courts follow the legislative intent as expressed by the text of the law. The district court, however, substituted its own assessment for the General Assembly's judgment and the Act's plain text, asserting that the Act's other provisions—the ultrasound disclosure, heartbeat disclosure, and reporting requirements—have no purpose independent from the challenged provision. Not only does the Act itself repudiate that assertion, but many States have passed—and courts have upheld—similar disclosure provisions, which provide critical information and necessary context for a mother considering an abortion.

The Abortion Centers' lawsuit, by contrast, seeks to deprive mothers of the right to receive relevant information. In these circumstances, the Constitution does not give the Abortion Centers third-party standing to represent the very women who would be harmed if the suit were to succeed—and who are even now being harmed due to the injunction. The Abortion Centers have no right to perform abortions, and they have not alleged the factual predicates for third-party standing: a close relationship, a hindrance to the first party in bringing suit, and a unity of interests. The district court did not disagree, instead holding that abortionists—alone among federal litigants—are exempt from the normal standing tests and therefore have automatic standing to challenge any abortion regulation, no matter the obvious (and

unique) conflicts of interests here and the absence of any close relationship or hindrance. No precedent sanctions such a disregard for the fundamental requirements of federal litigation.

Even if the Abortions Centers had third-party constitutional standing, they do not have statutory standing to assert their sole claim under 42 U.S.C. § 1983. Claims under that provision can be brought only by "the party" who herself suffers an alleged "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Interpreting the plain text of § 1983, this Court and essentially all others have held that the statute imposes liability only for violations of a party's *own* constitutional rights—not another party's. Because the Abortion Centers do not and cannot allege a violation of their own rights, they have no cause of action.

In short, the district court's preliminary injunction oversteps the bounds of federal judicial power. This Court should reverse and remand for dismissal or, at a minimum, vacate the injunction.

## JURISDICTIONAL STATEMENT

The district court purported to exercise subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. Because the court entered a preliminary injunction, this Court has jurisdiction under 28 U.S.C. § 1292(a)(1). The preliminary injunction was entered on March 19, 2021. Joint Appendix (App.) 282. Appellants filed a notice of appeal on April 2. App. 304.

## STATEMENT OF ISSUES

**I.**      Whether the Abortion Centers have third-party constitutional standing to assert a claim on behalf of women who they seek to deprive of rights.

**II.**     Whether § 1983 provides a derivative cause of action to parties that do not allege any personal deprivation of constitutional rights.

**III.**    Whether the district court erred or otherwise abused its discretion in enjoining provisions of the Act that, by legislative command, must be severed from the challenged provision.

## STATEMENT OF THE CASE

### A.      South Carolina's preexisting regulation of abortion

Like other states, South Carolina has long regulated abortions.  Chapter 41 of the South Carolina Code of Laws licenses and regulates abortion providers to ensure that they meet medical standards of care for their patients and provide vital health statistics to the South Carolina Department of Health and Environmental Control ("DHEC").  S.C. Code Ann. §§ 44-41-70, -75, -460.  The chapter provides rights to women seeking abortions, such as to informed consent, privacy of personal medical data, and access to information about their unborn child.  *Id.* §§ 44-41-37, -330, -360.  It also regulates how minors may obtain abortions, to protect them from abuse and ensure that their best interests are represented by a parent, guardian, or judge.  *Id.* §§ 44-41-31, -32, -33, -36, -37.  The chapter protects the rights of medical providers to decline to participate in abortions, *id.* §§ 44-41-40, -50, and it protects

unborn children from certain forms of abortion, including partial-birth abortion and abortions performed after 20 weeks of gestation, *id.* §§ 44-41-85, -450.  Performing or soliciting an illegal abortion is a felony.  *Id.* § 44-41-80(a).  Moreover, abortionists must report each abortion (though not the woman's name) to DHEC.  *Id.* §§ 44-41-60, -460.

Under these statutes, DHEC has issued regulations that "comprehensively regulate[] abortion clinics in South Carolina." *Greenville Women's Clinic v. S.C. DHEC*, 317 F.3d 357, 359 (4th Cir. 2002); *see also Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 160 (4th Cir. 2000) (noting that these regulations were developed in consultation with "medical standards and guidelines issued by medical care organizations" and were intended "to promote high quality care for all women seeking abortions").  These regulations have been upheld repeatedly by this Court, which has recognized their "presumptive constitutionality." *Bryant*, 222 F.3d at 165.  Among these regulations is a requirement that the abortionist perform an ultrasound if the woman is at least 14 weeks pregnant, along with a recommendation for an ultrasound if the woman is at least 12 weeks pregnant.  S.C. Code Ann. Regs. 61-12.301 (2021).

### B.    The Act

The South Carolina General Assembly overwhelmingly passed the South Carolina Fetal Heartbeat and Protection from Abortion Act on a bipartisan basis, 30-13

in the Senate and 74-39 in the House of Representatives. *See* Addendum (2021 S.C. Acts No. 1). The Act promotes South Carolina's "legitimate interests from the outset of a pregnancy in protecting the health of the pregnant woman and the life of the unborn child who may be born." Act § 2. In the Act, the General Assembly made several findings in accord with "contemporary medical research," including that "a fetal heartbeat is a key medical predictor that an unborn human individual will reach live birth." *Id.* The General Assembly found that "in order to make an informed choice about whether to continue a pregnancy, a pregnant woman has a legitimate interest in knowing the likelihood of the human fetus surviving to full-term birth based upon the presence of a fetal heartbeat." *Id.* In this respect, the Act is consistent with existing state law recognizing the heartbeat as a primary marker of the presence of human life. *See, e.g.*, S.C. Code Ann. § 44-43-460 ("An individual who has sustained irreversible cessation of circulatory and respiratory functions . . . is dead."); *id.* § 62-1-507(1) (same).

In accord with science and precedent, the Act defines an "unborn child" as "an individual organism of the species homo sapiens from fertilization until live birth." Act § 3; *see, e.g., Gonzales v. Carhart*, 550 U.S. 124, 160 (2007) (describing partial-birth abortion as a procedure in which the abortionist "pierce[s] the skull and vacuum[s] the fast-developing brain of [the] *unborn child*" (emphasis added)). The district court criticized this reference as an "attempt to define an embryo as

something other than an embryo," App. 227, but was conspicuously silent regarding the Abortion Centers' attempt to redefine unborn life as "the contents of a patient's uterus," App. 53. The district court also inexplicably complained that the "fetal heartbeat"—defined in the Act as "cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart," Act § 3—is "not actually a heartbeat." App. 235.

The Act seeks to promote the interests of "the health of the pregnant woman and the life of the unborn child who may be born" in several ways. Act § 2. It requires that before an abortion, the provider must perform an ultrasound "using whichever method the physician and pregnant woman agree is best under the circumstances," "display the ultrasound images so that the pregnant woman may view the images," and "record a written medical description of the ultrasound images of the unborn child's fetal heartbeat." *Id.* § 3 (S.C. Code Ann. § 44-41-630). If the women has been pregnant for at least ten weeks (eight weeks post-fertilization), then the abortionist must tell her that a heartbeat may be audible and use an ultrasound to allow her to hear the heartbeat, if she wishes. *Id.* (S.C. Code Ann. § 44-41-640). Before performing an abortion and absent a medical emergency, the provider must determine "whether the human fetus the pregnant woman is carrying has a detectable fetal heartbeat." *Id.* (S.C. Code Ann. § 44-41-650).

The Act provides a cause of action for a woman "on whom an abortion was performed or induced in violation of this article" and for a woman "on whom an abortion was performed or induced who was not given the information provided in Section 44-41-330," the preexisting statute requiring the provision of certain information. *Id.* (S.C. Code Ann. § 44-41-740). The Act provides for damages against the offending abortionist, as well as court costs and attorney's fees. *Id.* The Act makes clear that a pregnant woman cannot be prosecuted for violations of the Act. *Id.* (S.C. Code Ann. § 44-41-730).

The Act contains several additional disclosure, reporting, and recordkeeping requirements, which supplement the State's existing (and judicially upheld) abortion regulations. For instance, the required reports regarding abortions must contain information related to fetal heartbeat testing. *Id.* § 4 (S.C. Code Ann. § 44-41-460(A)). The abortionist must convey certain information to the mother "based on available medical evidence." *Id.* § 5 (S.C. Code Ann. § 44-41-330(A)(1)). And the Act updates preexisting reporting requirements. *Id.* § 6 (S.C. Code Ann. § 44-41-60).

The Act also contains a severability clause providing that if any part of the Act—even one "word"—is "held to be unconstitutional or invalid," the remaining portions are unaffected, "the General Assembly hereby declaring that it would have passed this act and each and every section, subsection, paragraph, subparagraph, sentence, clause, phrase, and word thereof, irrespective of the fact that" other

portions might be invalidated.  *Id.* § 7.  Finally, the Act took "effect upon approval by the Governor."  *Id.* § 9.

The Abortion Centers directly challenge only one provision of the Act.  Under that provision, if a heartbeat is detected, the abortionist may only perform an abortion in cases involving rape, incest, fetal anomalies, or where the abortion is "intended to prevent the death of the pregnant woman or to prevent the serious risk of a substantial and irreversible impairment of a major bodily function."  *Id.* § 3 (S.C. Code Ann. § 44-41-680).  Violation of this provision is a felony punishable by a fine of $10,000 or two years in prison.  *Id.* (S.C. Code Ann. § 44-41-680(D)).

### C.    Parties and proceedings below

The Abortion Centers offer "medication abortion and abortion by procedure." App. 53.  "Medication abortion involves the use of" "two medications taken to . . . end an early pregnancy in a process similar to a miscarriage."  *Id.*  By the Abortion Centers' description, "[a]bortion by procedure involves" "suction and/or the insertion of instruments through the vagina to empty the contents of a patient's uterus." *Id.*  What they call "the contents of the uterus" was, of course, an unborn child.  The Abortion Centers perform this "service" until the mother is 14 weeks pregnant.  App. 42, 54.

On February 18, 2021, the Abortion Centers filed this action before the Act was signed into law by Governor McMaster, nonetheless seeking to have the Act

declared unconstitutional and enjoined in its entirety as a purported violation of the "substantive due process rights of Plaintiffs' patients to previability abortion." ECF No. 1, ¶¶ 1, 37, 66–68; *see also* App. 33.

After an initial hearing—and despite the Abortion Centers' lack of standing at the time they filed their complaint—the district court issued a temporary restraining order against the operation of the entire Act. App. 79. Even after the obvious jurisdictional deficiency was pointed out, the district court extended the TRO. App. 98. Nearly a month later, the Abortion Centers finally amended their complaint to challenge the law rather than proposed legislation. App. 18. The only cause of action remained 42 U.S.C. § 1983. *Id.*

Nine days later, without any motion being filed as to the new operative complaint, the district court issued a preliminary injunction restraining the defendants from enforcing the entire Act statewide. App. 303. In the court's view, abortionists may "assert the constitutional rights of their patients." App. 289. The court did not address the third-party standing factors, instead noting that the Act subjects the Abortion Centers to "'felony criminal and other penalties'" for violating it. *Id.* The court did not note or analyze that the Abortion Centers' lawsuit seeks to deprive mothers of rights, or that one of the penalties under the Act is a civil remedy against the abortionist *by the mother*.

According to the district court, its holding also encompassed any statutory challenge to the Abortion Centers' ability to maintain a third-party, derivative § 1983 claim. *See* App. 197 ("[T]he Court previously concluded, in its [Preliminary Injunction] Order that Plaintiffs are able, under Section 1983, to assert a claim on behalf of their patients."). The court did not analyze § 1983's text or the Abortion Centers' failure to allege that *they* were deprived of any constitutional right and therefore to state a cognizable § 1983 claim.

As to the single challenged provision, the court rejected the argument that "'[p]reviability regulations are subject to *Casey*'s undue burden standard[].'" App. 289–90. Relying in part on a case in which the Supreme Court recently granted certiorari, the district court instead adopted the view "'that any previability limitation on abortion is automatically unconstitutional.'" App. 290–91 (citing *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265 (5th Cir. 2019)).[1]

Finally, the court found that all the Act's other provisions should also be enjoined. Without citation or explanation—much less any discussion of the Act's robust severability clause—the court said that the "only purpose" of the Act's "mandatory ultrasound disclosure provision" "is to facilitate" the challenged provision.

---

[1] Particularly given the Supreme Court's recent grant of certiorari in *Dobbs v. Jackson Women's Health Organization*, No. 19-1392 (U.S.), Appellants reserve the right to challenge this aspect of the district court's reasoning in the ongoing proceedings below and on any subsequent appeal.

App. 298–99.  The court then asserted that "a review of the remaining provisions of Section 3 of the Act lead[s] to the inescapable conclusion they are also so intertwined with [the ultrasound disclosure provision and the challenged provision] so as to preclude severability."  App. 299.  And because other sections of the Act "reference[] the words 'fetal heartbeat,'" the court concluded that they "must be enjoined as well."  *Id.*  The court found it "nothing short of baffling when Defendants here make the fanciful, misbegotten, and misguided argument that the Act is constitutional."  App. 302.  It was "unable to fathom how another court could decide this issue differently."  *Id.*

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy" that "shall be granted only if the moving party clearly establishes entitlement to the relief sought."  *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).  "A plaintiff seeking a preliminary injunction must demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  To satisfy the first preliminary injunction factor, the Abortion Centers "must make a clear showing that [they are] likely to succeed at trial."  *Id.*

Legal conclusions made in a preliminary injunction are reviewed de novo. *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 302 (4th Cir. 2020). Otherwise, the Court generally "evaluate[s] a district court's decision to grant preliminary injunctions under an abuse of discretion standard." *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). But "[b]ecause preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power," the Court is "particularly exacting in its use of the abuse of discretion standard." *Id.* (cleaned up). "A district court abuses its discretion by applying an incorrect preliminary injunction standard, by resting its decision on a clearly erroneous finding of a material fact, or by misapprehending the law with respect to underlying issues in litigation." *Raymond*, 981 F.3d at 302 (cleaned up).

## SUMMARY OF ARGUMENT

By enjoining the entirety of the Act, the district court exceeded its Article III authority in multiple ways. The preliminary injunction must be reversed.

**I.** The district court erred in holding that abortionists, unlike all other litigants, need not satisfy the third-party constitutional standing requirements. Neither the Abortion Centers nor the district court even attempted to suggest that the Abortion Centers could meet those requirements. For good reason: They could not. The history of women vindicating their own rights disproves any paternalistic suggestion that women need abortionists to speak for them. And the Abortion Centers' abstract

and amorphous relationship with those they seek to represent is rife with conflicts. A ruling for the Abortion Centers would benefit abortionists at the expense of mothers, who could make a more informed decision with the information the Centers want to withhold—and could sue the Centers if deprived of that information. No court has approved third-party standing in such a case. And neither the Supreme Court nor this Court has held that abortionists alone are exempt from the third-party standing requirements, particularly in a case where, as here, inherent and unavoidable conflicts of interest are obvious within the four corners of the complaint.

**II.**    The Abortion Centers also lack statutory standing. As virtually all circuits have held, the only party to whom § 1983 gives a cause of action is the person subjected to a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." The Abortion Centers are not such parties, because they have no constitutional right to abort unborn children. Settled § 1983 precedents forbid even immediate family members from asserting claims on behalf of relatives. If a wife cannot vindicate her dead husband's rights, the Abortion Centers certainly cannot sue to deprive their hypothetical customers of rights.

**III.**    Finally, the district court's injunction is overbroad. The vast majority of the Act's provisions contain disclosure, reporting, and recordkeeping requirements that are not directly challenged by the Abortion Centers and are no different from provisions routinely upheld by courts. And the Act contains an express

severability clause declaring the General Assembly's intent to pass every "word" of the Act, notwithstanding portions that might be invalidated. The district court substituted its own views of the Act's purposes for the General Assembly's intent as evidenced by the Act's plain text, and it compounded this error by failing to address any of the other preliminary injunction factors as to the remainder of the Act. At a minimum, the Court should vacate the district court's overbroad injunction.

## ARGUMENT

### I. The Abortion Centers lack third-party constitutional standing.

Standing in an "indispensable part" of every case, and a plaintiff bears the burden of proving standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Generally, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Only in those "limited" circumstances "where it is *necessary* to grant a third party standing" can a litigant "assert the rights of another." *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004) (emphasis added). For instance, in certain contexts, a parent can assert a child's rights—though not always, even in that intimate relationship where the parent is often *required* to act on the child's behalf. *Compare Prince v. Massachusetts*, 321 U.S. 158 (1944), *with Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004) (no standing where "the interests of this

parent and this child are not parallel and, indeed, are potentially in conflict"), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

Thus, beyond the usual standing "minimum[s]," "a party seeking third-party standing [must] make two additional showings": (1) that it "has a 'close' relationship with the person who possesses the right," and (2) that "there is a 'hindrance' to the possessor's ability to protect h[er] own interests." *Kowalski*, 543 U.S. at 129–30 (quoting *Powell v. Ohio*, 499 U.S. 400, 411 (1991)). And if the plaintiff's and the first party's interests "are potentially in conflict," there is no third-party standing. *Newdow*, 542 U.S. at 15. This Court has recognized that a "fail[ure] to allege" and provide "evidence" of even one of these factors dooms any third-party standing effort. *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214–15 (4th Cir. 2002) (holding that a doctor who failed to "allege a hindrance to her patients' ability to protect their own interests" "lacks standing"). Like all standing questions, these are assessed on a case-by-case basis, "on the asserted claim." *Warth*, 422 U.S. at 510; *see id.* at 501–02.[2]

---

[2] Though the Supreme Court has not resolved third-party standing's "proper place in the standing firmament," it has emphasized that "third-party standing is closely related to the question whether a person in the litigant's position will have a right of action on the claim"—suggesting it has a jurisdictional dimension. *Lexmark*, 572 U.S. at 127 n.3 (cleaned up); *see United States v. Under Seal*, 853 F.3d 706, 722 n.5 (4th Cir. 2017). Whatever the test's label, the Abortion Centers cannot succeed.

Here, the Abortion Centers lack standing to assert their conflicted, derivative claim because it is based entirely on "the substantive due process rights of [their] *patients*." App. 33 (emphasis added). No women—and certainly no current or future patients—are plaintiffs, and the Abortion Centers do not claim (and do not have) any constitutional right to abort unborn children. Yet the Abortion Centers have not attempted to carry their burden of showing third-party standing: They have suggested no close relationship with women they might sell their services to, much less a hindrance to such women asserting their own rights. And any suggestion of a unity of interests would be fatally undercut by the fact that the Abortion Centers seek relief that will harm the women they purport to stand in for, depriving mothers of vital information and the ability to vindicate statutory rights *against them*. No court has sanctioned third-party standing in a case like this. Yet in the Abortion Centers' and the district court's view, abortionists have automatic third-party standing to challenge *any* regulation pertaining to their businesses, regardless of whether they satisfy (or even allege) the third-party standing requirements or whether the regulation protects mothers *from them* or gives mothers a cause of action *against them*. That is not and cannot be the law.

### A. The Abortion Centers did not demonstrate or even allege the factual predicates for third-party standing.

Again, a third-party plaintiff must show a close relationship with the first party, a hindrance to that party's ability to protect its interests, and a unity of

interests. *Kowalski*, 543 U.S. at 130. Here, the Abortion Centers refused to discuss these elements whatsoever, much less allege relevant facts or show that they are likely to succeed in proving them.

First, the Abortion Centers did not plead facts or offer any evidence regarding any degree of closeness between them and women who might use their services. The abortionists are obviously "involved" in the abortion procedure, *Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (plurality opinion), but they have not pleaded or shown any evidence of a close relationship, much less one that is free from obvious conflicts. If anything, their allegations and declarations undermine any suggestion of such a relationship. They say that women who use their services "obtain an abortion as soon as they are able," App. 29, 57, ruling out any suggestion of long-term treatment or counseling relationships. They highlight their desire to provide abortion pills without even seeing the mother in person. App. 31, 43, 62. They emphasize that one center had "abortions scheduled for 56 patients" on a *Saturday* in February. App. 67. With such a volume, no meaningful interaction is possible. There is no close relationship. *See McCorvey v. Hill*, 385 F.3d 846, 851 (5th Cir. 2004) (Jones, J., concurring) ("[W]omen are often herded through their procedures with little or no medical or emotional counseling.").

Second, the Centers have not suggested any hindrance whatsoever to women asserting their own rights. As this Court has held, a party's "fail[ure] to allege" and

provide "evidence" of "sufficient obstacles to the patients bringing suit themselves" requires dismissal of a third-party claim—including in the doctor-patient context. *Freilich*, 313 F.3d at 215. Moreover, it is beyond dispute that South Carolina women can challenge abortion regulations—as individual women have done in numerous other abortion cases across the country.[3] This history "disprove[s]" any hindrance as a matter of law. *Kowalski*, 543 U.S. at 132; *see also Hodak v. City of St. Peters*, 535 F.3d 899, 904–05 (8th Cir. 2008) (collecting cases). Contrary to the Abortion Centers' patronizing suggestion, women do not need abortionists to speak for them.

Third, the relationship between the Abortion Centers and the women they purport to speak for is not only attenuated, but also riven with conflicts. The Supreme Court has held that when a plaintiff's interests are even "potentially in conflict" with the first party's interests, third-party standing does not exist. *Newdow*, 542 U.S. at 15. Multiple conflicts exist here.

One conflict involves the Act's requirements that the abortionist give the mother certain information before any abortion is performed. For instance, the abortionist must give the mother the choice to see the ultrasound, tell the mother (if she

---

[3] *See, e.g.*, *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam); *Hodgson v. Minnesota*, 497 U.S. 417, 429 (1990); *H.L. v. Matheson*, 450 U.S. 398, 400 (1981); *Williams v. Zbaraz*, 448 U.S. 358, 361 (1980); *Harris v. McRae*, 448 U.S. 297, 303 (1980); *Poelker v. Doe*, 432 U.S. 519, 519 (1977) (per curiam); *Maher v. Roe*, 432 U.S. 464, 467 (1977) (all involving women seeking abortions and asserting their own rights as plaintiffs).

is at least ten weeks pregnant) that a heartbeat may be audible, and give her the option to hear it. *See* Act § 3. The Abortion Centers—who charge women for ultrasounds—object to providing mothers this information. But this information is important for at least two reasons. First, as the Supreme Court has said, "[e]ven in the earliest stages of pregnancy, the State may enact rules and regulations designed to encourage [the mother] to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term." *Casey*, 505 U.S. at 872.

Second, during consideration of this Act, women who have had abortions testified that because they were deprived of such information, they were set on paths of suicide, depression, shame, and regret. *See, e.g.*, *Hearings on S. 1 Before the S.C. Senate Medical Affairs Subcomm.*, 124th Sess. (Jan. 14, 2021, at 2:15.00), https://bit.ly/36cqU0j. "It is self-evident that a mother who comes to regret her choice to abort must struggle with grief more anguished and sorrow more profound when she learns, only after the event, what she once did not know." *Gonzales*, 550 U.S. at 159–60.

By the Abortion Centers' own telling, they want to deprive mothers of much besides the choices to see an ultrasound and hear the heartbeat. They complain at length about their legal requirements to provide women information about abortion and other health regulations, notwithstanding that this Court has squarely rejected

the argument that these regulations are "unnecessary." *See* App. 31, 43, 61; *Bryant*, 222 F.3d at 175 (explaining that South Carolina's regulations result in "increased medical safety" and assurance "of a dignified and safe procedure," which "serves the complex public interests on the subject"). They complain about the difficulties women have in paying their fees and that some "take longer to make a decision" and cannot always purchase their services immediately. App. 30, 43–44, 60, 66. And they complain that the State gives women information that might lead them to not pay for the Abortion Centers' "services." App. 25, 31, 66.

Because the Abortion Centers do not want to give mothers sufficient information to make an informed, irreversible decision, they cannot "reasonably be expected properly to frame the issues" in this case. *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). There is no reason to think that a mother would prefer to be deprived of the option to receive relevant information like an ultrasound of her child. This conflict of interest confirms the "longstanding principle that [first] parties themselves usually will be the best proponents of their own rights." *Freilich*, 313 F.3d at 215 (cleaned up).

Another particularly telling conflict is that the Act grants a woman who is not given the required information a private cause of action against the abortionist. *See* Act § 3 (S.C. Code Ann. § 44-41-740). For example, if the abortionist fails to give the mother sufficient information to make an informed decision or the option to

listen to her child's heartbeat or view the ultrasound, she would have a cause of action against him. And if the abortionist unlawfully terminates a child with a heartbeat, the mother could sue him. But not if the Abortion Centers get their way. Not only do they seek to deny mothers the option to listen to the heartbeat *and* see the ultrasound *and* receive adequate information *and* know that the child aborted did not have a heartbeat, they also seek to deny mothers the ability to vindicate their statutory rights in court *against the Abortion Centers themselves*. A starker conflict of interest can scarcely be imagined.

Courts routinely deny third-party standing in such circumstances. *See, e.g.*, *Friedman v. Harold*, 638 F.2d 262, 266 & n.8 (1st Cir. 1981) (denying standing where "the third party's 'rights' are being used as a means of helping the litigant to the detriment of the person or persons whose rights are being asserted"); *Am. Libr. Ass'n v. Odom*, 818 F.2d 81, 87 (D.C. Cir. 1987) (similar); *cf. Cap. Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 700 n.6 (1984) ("[R]espondent plainly lacks standing to raise a claim concerning his adversaries' constitutional rights in a case in which those adversaries have never advanced such a claim.").

Indeed, *no* case analyzing such a conflict has held that a third party has standing to attack legal rights of the first party against the third party itself. Undoubtedly, the Abortion Centers will recycle a laundry list of other abortion cases that did not

discuss such a conflict and found either that the third-party standing requirements were satisfied in the particular case or that the argument had been waived.

These cases are irrelevant, and the Abortion Centers' anticipated reliance on their inapposite (or absent) analysis is unavailing. Here, a uniquely severe and obvious conflict exists on the face of the law. The Abortion Centers have made no effort to even allege the third-party standing requirements. And the argument has not been waived.

By contrast, for example, the *June Medical* plurality's discussion of the merits of third-party standing was dicta (as the argument had been waived), was not binding (as not joined by a majority), never suggested *any* conflict of interests, and was necessarily confined to the facts of the case and the challenged law. *See June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103, 2118 (2020) (plurality opinion) ("The State's unmistakable concession of standing . . . bars our consideration of it here."). Yet the Abortion Centers will cite *June Medical* and other irrelevant cases instead of any case that actually analyzes a conflict like the one here—because no such case exists that sanctions third-party standing.

Finally, the Abortion Centers' desire to operate their businesses free from government oversight poses an actual or potential conflict with the paramount health and safety interests of women using their services. Abortion "involve[es] the most intimate and personal choices a person may make in a lifetime." *Casey*, 505 U.S. at

851. As this Court has recognized, women making these decisions have an interest in ensuring their own health and safety, and states can promote and protect that interest. *See Bryant*, 222 F.3d at 173, 175. South Carolina has done so in passing the Act. But the Abortion Centers' interest is to reduce compliance costs and oversight while providing as many abortions as possible.

In sum, it is unsurprising that the Abortion Centers wish to expedite abortion procedures and avoid both reasonable oversight and legal accountability. No business likes to be regulated or sued. But it would be unprecedented to hold that the Abortion Centers may stand in for the very women who they seek to deprive of information, options, and legal rights.

## B. The Abortion Centers do not have automatic third-party standing.

In the district court's and the Abortion Centers' views, the third-party standing requirements are simply inapplicable in a single category of federal cases: those involving abortion. Thus, the district court did not question any of the points above or account for these longstanding legal principles. Instead, it believed that the Abortion Centers were likely to succeed on third-party standing for two reasons: (1) because the Abortion Centers allege an injury-in-fact, and (2) because abortionists always have standing to assert hypothetical patients' rights. Both preliminary conclusions are error. *See Raymond*, 981 F.3d at 302 ("A district court abuses its

discretion . . . by misapprehending the law with respect to underlying issues in litigation." (cleaned up)).

First, according to the district court, "abortion providers [can] sue on their own behalf when challenged legislation or regulations operate directly against them." App. 288. But that means nothing more than that the abortionists alleged an injury-in-fact and might have first-party standing *if* they were asserting their own constitutional claims. Here, they are not. And as this Court (and all others) have made clear, the third-party standing requirements are *in addition* to Article III's injury-in-fact requirement. *E.g.*, *Freilich*, 313 F.3d at 215 (explaining that "a plaintiff must demonstrate" "an injury-in-fact" *and* "a close relationship" and "a hindrance"). Otherwise, there would be no third-party standing limitation at all, and no discussion of third-party standing would have been necessary in *June Medical*, *Singleton*, or any other case. *See Warth*, 422 U.S. at 499 (explaining that "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests").

The second basis for the district court's refusal to address the third-party standing requirements was its view that "the Supreme Court has long established that abortion providers have standing to assert their patients' rights." App. 288 (citing *Singleton* and *June Medical*). The Abortion Centers claim that they—unlike *every other* litigant in *every other* type of case—need not prove *any* of the third-

party standing requirements to assert the constitutional rights of another.  But "standing is not dispensed in gross," including to abortionists for any and all claims.  *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).  Standing is necessarily a case-by-case inquiry.  *See Freilich*, 313 F.3d at 215.  Yet the Abortion Centers have not made any of the necessary allegations.

*Singleton* and *June Medical* do not set forth a *per se* rule that abortionists always have third-party standing.  According to the district court, the *June Medical* "majority opined abortion providers have standing to assert the constitutional rights of their patients."  App. 288.  That is wrong for at least two reasons.  For one, there was no majority opinion in *June Medical*.  For another (and as noted), the plurality held that the issue had been "waived," "bar[ring]" the Court's consideration.  140 S. Ct. at 2117–18.  Chief Justice Roberts, in his controlling concurrence, agreed only that the abortionists "*in this case* have standing."  *Id.* at 2139 n.4 (emphasis added).[4] Another state's concession that abortionists have standing to challenge that state's law does not prevent South Carolina from contesting different abortionists' standing to challenge a different law involving different facts.

---

[4] The dissenting Justices said that the plurality resolved the issue on waiver, not the merits, and no Justice disagreed.  *See* 140 S. Ct. at 2143 (Thomas, J., dissenting) ("[U]ltimately, [the plurality] dodges the question, claiming that Louisiana's standing challenge was waived below."); *id.* at 2165 (Alito, J., dissenting) (similar).

As for *Singleton*, the plurality there spent pages applying the third-party requirements set forth above, describing them as "factual." 428 U.S. at 112–18. Yet the district court here never engaged in *any* factual analysis to determine if these requirements were satisfied. Of course, the court had nothing to analyze, since the Abortion Centers failed to make any relevant allegations, much less provide evidence to establish a likelihood of success—even though it is their burden throughout the litigation to demonstrate standing.

In any event, the *Singleton* plurality's fact-intensive, pages-long discussion of these requirements disproves that there is any automatic abortionist standing rule. That is especially true since the controlling concurrence in *Singleton* found standing based on "two facts": (1) the abortionists had "a financial stake in the outcome of the litigation," and (2) they claimed "that the statute impair[ed] their own constitutional rights." *Id.* at 121 (Stevens, J., concurring in part); *see Marks v. United States*, 430 U.S. 188, 193 (1977) (narrowest opinion controls). Here, the Abortion Centers do not and cannot claim that the Act impairs their rights.

Whatever was true in other cases involving other facts, the Abortion Centers seek here to *deny* mothers rights by depriving them of the opportunity to view an ultrasound of their child, withholding relevant information from them, and stripping them of their right to sue the Centers. Contra the district court, that is not "assert[ing] their patients' rights," App. 288—it is taking them away. Again, neither the district

court nor the Abortion Centers identified any case finding third-party standing where the third-party plaintiff brought a derivative action to deprive the first party of legal causes of action *against the plaintiff.*

Analyzing such a scenario in any other medical or doctor-patient context underscores the unsoundness of the district court's new automatic abortionist standing rule. For instance, if abortionists, under the guise of vindicating rights of actual or hypothetical customers, can automatically challenge any regulation that affects their business—regardless of how directly the regulation protects such customers *from them*—there is no apparent reason they could not sue "on behalf of" women to disregard HIPAA's protections of personal patient information. Or challenge any sanction against abortionists who provide "egregious and substandard care" to the women who they supposedly represent. *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 802–03 (7th Cir. 2013) (Manion, J., concurring in part and in judgment) ("Dr. Gosnell physically assaulted and performed a forced abortion on a minor and left fetal remains in a woman's uterus causing her excruciating pain."); *id.* at 807–10 (collecting similar examples).

In no other area of law would such an absurd proposition be countenanced, and the Court should not endorse it here. Abortionists do not have a special exemption from fundamental legal principles or ordinary litigation rules. Because the

Abortion Centers do not even try to follow those rules here, they cannot succeed. The injunction should be reversed, and the case remanded for dismissal.

## II. The Abortion Centers lack statutory standing.

Even if the Abortion Centers had standing in the constitutional sense, they lack statutory standing. So-called "statutory standing" involves whether the plaintiff has "a cause of action under the statute." *Lexmark*, 572 U.S. at 128 & n.4. When analyzing this question, the Court's "task is essentially one of statutory construction," and if "the statutory language provides a clear answer, [the] analysis begins and ends with that language." *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 53 (4th Cir. 2011) (cleaned up).

The Abortion Centers assert only one cause of action: 42 U.S.C. § 1983. App. 18, 33. But as this Court has explained and the other circuits broadly agree, "[a] section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else." *Howerton v. Fletcher*, 213 F.3d 171, 173 (4th Cir. 2000) (quoting *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990)). Thus, "the section 1983 plaintiff" does not have "standing to seek and obtain relief for [deprivation of rights] against third parties." *Id.* Because the Abortion Centers here assert *only* such third-party rights, they cannot succeed.[5]

---

[5] By the district court's explanation, its preliminary injunction order "concluded . . . that Plaintiffs are able, under Section 1983, to assert a claim on behalf of their patients." App. 197. The court offered no further analysis.

**A.      Section 1983 limits claims to the person deprived of rights.**

Section 1983 provides that:

> Every person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, *shall be liable to the party injured* in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (emphasis added).

Under "the language of § 1983," "[t]he appropriate plaintiff is obvious." *Andrews v. Neer*, 253 F.3d 1052, 1056 (8th Cir. 2001).  Only "*the* party injured" may bring an action, not "*a* party injured."  And the definite article "the" signifies that "*the* party injured" refers to the statute's earlier description of the "citizen" or "other person" who allegedly suffered the deprivation of legal rights.

"[G]rammar and usage establish that 'the' is a function word indicating that a following noun or noun equivalent is definite or has been previously specified by context." *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) (cleaned up).  Moreover, "the use of the definite article indicates that there is generally only one person covered." *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1514 (2019) (cleaned up).  "The only antecedent possible" here is the "citizen" or "other person" identified earlier in the sentence.  *Miller's Apple Valley Chevrolet Olds-Geo, Inc. v. Goodwin*, 177 F.3d 232, 234 (4th Cir. 1999).  Because "courts must presume that a legislature says in a statute what it means and means in a statute what it says there,"

and the words of § 1983 "are unambiguous," the "judicial inquiry is complete." *Lee v. Boeing Co.*, 123 F.3d 801, 805 (4th Cir. 1997) (cleaned up).  Section 1983 provides a cause of action for plaintiffs who assert that *they* were deprived of legal rights—and no one else.  Because the Abortion Centers do not assert that *they* were deprived of any constitutional right, their sole claim fails as a matter of law.  The district court's recognition of the Abortion Centers' derivative § 1983 claim—and issuance of extraordinary injunctive relief based on that conflicted cause of action—constitutes reversible error.

### B. Courts and scholars agree that § 1983 does not provide a cause of action for third parties.

This Court has said that "the section 1983 plaintiff" does not have statutory "standing to seek and obtain relief for [deprivation of rights] against third parties." *Howerton*, 213 F.3d at 173.  This has long been Circuit law: "to state a civil rights claim upon which relief can be granted under 42 U.S.C. § 1983, one must allege that he, himself, sustained a deprivation of a right, privilege or immunity secured to him by the Constitution and laws of the United States." *Inmates v. Owens*, 561 F.2d 560,

562–63 (4th Cir. 1977).[6] This rule follows from the text of § 1983 and is consistent with what other courts and scholars have said about it.

Other circuits agree with this Court's interpretation: "The § 1983 cause of action, by virtue of the explicit language of the section itself, is a personal action cognizable only by the party whose civil rights had been violated." *Jaco v. Bloechle*, 739 F.2d 239, 241–42 (6th Cir. 1984); *see also, e.g.*, *Barber v. Overton*, 496 F.3d 449, 458 (6th Cir. 2007) (Section 1983 "does not confer standing on anyone injured as a result of the government's violation of another person's rights, no matter how interrelated the harms suffered."); *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000) ("[A] section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort."); *Ray v. Maher*, 662 F.3d 770, 773–74 (7th Cir. 2011) (calling it a "bedrock principle of § 1983 law" that "§ 1983 claims are personal to the injured party"); *Garrett v. Clarke*, 147 F.3d 745, 746 (8th Cir. 1998) ("Garrett may not base his Section 1983 action on a violation of the rights of third

---

[6] *See also, e.g.*, *English v. Powell*, 592 F.2d 727, 730 (4th Cir. 1979) (explaining that a wife "cannot rest her claim to relief solely on the legal rights of her husband"); *Settle v. Slager*, 2015 WL 12865194, at *2 (D.S.C. May 20, 2015) ("A § 1983 claim must be based on the violation of one's own rights, not the rights of someone else."), *aff'd*, 628 F. App'x 206 (4th Cir. 2016) ("Settle has no standing to assert the constitutional rights of a third party"); *Mitchell v. Cannon*, 2009 WL 824202, at *18 (D.S.C. Mar. 26, 2009) ("Plaintiff may not base a § 1983 claim on a violation of the rights of third parties."), *aff'd*, 367 F. App'x 390 (4th Cir. 2010); *Assa'd-Faltas v. Weiss*, 2015 WL 4487759, at *6 (D.S.C. July 23, 2015) (same), *aff'd*, 639 F. App'x 181 (4th Cir. 2016).

parties."); *Brossart v. Janke*, 859 F.3d 616, 627 n.7 (8th Cir. 2017) (holding that "the Amended Complaint failed to assert a § 1983 claim for" a "derivative" injury); *Advantage Media, LLC v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) (noting that § 1983 imposes liability "only for violations of a party's own constitutional rights"); *Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 907 (9th Cir. 2007) (same); *McKelvie v. Cooper*, 190 F.3d 58, 64 (2d Cir. 1999) (stating the "well-settled principle that a section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else" (cleaned up)); *Archuleta*, 897 F.2d at 497 (same, and collecting cases); *Barker v. Halliburton Co.*, 645 F.3d 297, 300 (5th Cir. 2011) ("A third party may not assert a civil rights claim based on the civil rights violations of another individual."); *Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) (explaining that § 1983 plaintiffs are "required to prove some violation of their personal rights," and collecting cases); *Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1047 (11th Cir. 2011) ("[B]y its own terms, § 1983 grants the cause of action 'to the party injured.'").

As the Tenth Circuit explained in one case, though "a father is closely related to the son and, thus, he feels the injury to a tremendous extent when his son suffers death," a "§ 1983 civil rights action is a personal suit" that "does not accrue to a relative, even the father of the deceased." *Dohaish v. Tooley*, 670 F.2d 934, 936–37 (10th Cir. 1982). Nor can a person state a § 1983 claim based on "indirect injuries

allegedly caused to him by reason of any constitutional tort suffered by his spouse." *Claybrook*, 199 F.3d at 358 n.9. If § 1983 does not allow a father to sue on behalf of his dead son or a husband to sue on behalf of his wife, it certainly does not allow the Abortion Centers to maintain a derivative cause of action on behalf of hypothetical customers.

Of note, there is little question that a father-son or husband-wife relationship would satisfy the third-party constitutional standing requirements discussed in Part I, but that does not answer this statutory question. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017) (stating that a father-son relationship "easily satisfies the 'close relationship' requirement," as well as "the 'hindrance' requirement" when one of them dies). Otherwise, none of the cases cited above—many of which involved surviving spouses or children—would have involved any significant legal question. *Of course* the surviving relative has a "close relationship" with the decedent, who *of course* has a significant "hindrance" to bringing his own action. But that is insufficient, because § 1983 does not allow a plaintiff to sue based on a purported deprivation of someone else's legal rights.

Scholars too agree with this interpretation. As Professor Currie explained, Section 1983 "authorizes suit by anyone alleging that he has been deprived of rights under the Constitution or federal law, and by no one else." David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45. Section 1983 "thus incorporates,

*but without exceptions*, the Court's 'prudential' principle that the plaintiff may not assert the rights of third parties." *Id.* (emphasis added); *see also* 1 Sheldon H. Nahmod, *Civil Rights & Civil Liberties Litigation: The Law of Section 1983* § 1:10 (4th ed. 2020) (explaining that a "§ 1983 cause of action . . . is given to [any person] who has suffered the deprivation of constitutional or certain federal statutory rights"); William Theis, Shaw v. Garrison*: Some Observations on 42 U.S.C. § 1988 and Federal Common Law*, 36 La. L. Rev. 681, 690 (1976) ("It would be a strained reading of section 1983 to say that the 'person' deprived of his rights and the 'party injured' were not always identical.").

### C.   The Supreme Court's discussions of § 1983 are predicated on this interpretation.

Even in more general § 1983 cases, the Supreme Court's and this Court's discussions of the statute are predicated on the rule that a plaintiff may not bring a § 1983 claim based on a deprivation of someone else's legal rights.  According to the Supreme Court, the "plain words of the statute impose liability . . . only for conduct which 'subjects, or causes to be subjected' *the complainant* to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370–71 (1976) (emphasis added).  The Court has always interpreted § 1983 as providing a cause of action only to parties who *themselves* suffered a deprivation of legal rights. *See, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017) ("[Section 1983] entitles an injured person to money damages if a state official violates his or her constitutional

rights."); *Inyo County v. Paiute-Shoshone Indians*, 538 U.S. 701, 708 (2003) ("[Section 1983] permits 'citizens' and 'other persons within the jurisdiction' of the United States to seek legal and equitable relief from 'persons' who . . . deprive them of federally protected rights." (brackets omitted)); *Felder v. Casey*, 487 U.S. 131, 139 (1988) (explaining that "Section 1983 creates a species of liability in favor of persons deprived of their federal civil rights").

This Court has likewise required that "[o]ne alleging a violation of section 1983 must prove that the charged state actor . . . deprived plaintiff of a right secured by the Constitution and laws of the United States." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Once again, its discussions of § 1983 confirm that the statute confers a cause of action only on the person actually deprived of constitutional rights. *See, e.g., id.* (Section 1983 "is a federal statutory remedy available to those deprived of rights secured to them by the Constitution"); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009) ("To state a claim under § 1983, a plaintiff must aver that a person acting under color of state law deprived him of a constitutional right or a right conferred by a law of the United States."); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727 (4th Cir. 1999) (explaining that a § 1983 plaintiff has "the burden to establish that she was 'deprived of a right secured by the Constitution or laws of the United States'").

**D. Under this settled interpretation of § 1983, the Abortion Centers do not have a valid cause of action.**

Here, the Abortion Centers affirmatively allege that other persons—and only those persons—suffered the alleged deprivation of legal rights. App. 33; *see Casey*, 505 U.S. at 884 (emphasizing that any right of the abortionist is purely "derivative of the woman's position"); *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 910 (6th Cir. 2019) (en banc) (noting that abortionists "do not have a due process right to perform abortions"). Therefore, the Abortion Centers are not "the party injured" under § 1983 and cannot state a claim, much less demonstrate a clear likelihood of success in maintaining an unsanctioned cause of action that is untethered from the text of § 1983.

Yet again, the Abortion Centers will point to various abortion cases that did not consider or analyze this issue, and instead focused on the third-party constitutional standing doctrine discussed in Part I. But if an issue is not "raised in briefs or argument nor discussed in the opinion," the opinion is "not a binding precedent" on that issue. *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952). Even as to the federal courts' "own judicial power or jurisdiction"—which, unlike statutory standing, must be considered *sua sponte*—the Supreme Court "has followed the lead of Chief Justice Marshall who held that this Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed *sub silentio*." *Id.* "[U]nder our adversarial system of justice, an unchallenged and

untested assumption is simply not a holding that binds future courts." *United States v. Norman*, 935 F.3d 232, 241 (4th Cir. 2019).  As shown, any assumption that a party who did not suffer a deprivation of legal rights can nonetheless bring a § 1983 claim would run headlong into a wall of precedents that actually considered this issue—including binding Circuit precedent.  *See, e.g.*, *Howerton*, 213 F.3d at 173.

At bottom, Section 1983 is not a master key to the courthouse doors allowing third-party litigants to invoke federal jurisdiction, whether for purposes of pre-screening proposed legislation or invalidating duly enacted laws purportedly on behalf of unidentified individuals.  Accepting the Abortion Centers' self-serving invitation to proceed down this unprecedented path—and, in turn, opening jurisdictional doors not contemplated or created by Congress for third parties and professional plaintiffs—should give the Court pause.  Since the Abortion Centers' only cause of action is under § 1983 and they cannot state a derivative § 1983 claim, they cannot succeed.  Accordingly, in light of this Court's precedent and § 1983's plain text, the Court should reverse the district court's injunction and remand the case for dismissal.

### III.    The district court erred in enjoining the entire Act.

Even putting aside the fatal flaws in the Abortion Centers' novel theory of automatic abortionist standing and their derivative § 1983 claim, the district court's injunction cannot stand.  Most of the Act consists of various disclosure, notice,

recordkeeping, and reporting requirements that the Abortion Centers do not directly challenge. Yet the district court preliminarily enjoined enforcement of the entire Act. Particularly given the Act's severability clause, which directs that every single "word" go into effect regardless of what happens to other portions of the Act, this sweeping injunction was error. And it was doubly erroneous because the district court made no findings whatsoever regarding the Act's unchallenged provisions and the preliminary relief factors other than likelihood of success.

### A. The Abortion Centers did not and cannot show a clear likelihood of success in attacking the entire Act.

The "duty" of the federal courts is to "maintain the [A]ct in so far as it is valid." *United States v. Miselis*, 972 F.3d 518, 541 (4th Cir. 2020) (cleaned up). Thus, this Court applies "a strong presumption of severability," *id.*, with "the normal rule [being] that partial invalidation is the required course," *Ameur v. Gates*, 759 F.3d 317, 325 (4th Cir. 2014) (cleaned up); *see also United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1986 (2021) (plurality opinion). The presumption of severability is stronger still in the presence of a severability clause. *See Pittston Co. v. United States*, 368 F.3d 385, 400 (4th Cir. 2004); *see also, e.g.*, *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 239 (4th Cir. 2016) ("We sever the challenged provisions from the remainder of the law because it contains a severability clause to which we defer under [state] law." (citation omitted)). And of course, all "[i]njunctions must

be narrowly tailored and should prohibit only unlawful conduct." *CPC Int'l, Inc. v. Skippy Inc.*, 214 F.3d 456, 461 (4th Cir. 2000).

The injunction issued below, however, prohibits and enjoins independent provisions of the Act that the Abortion Centers do not even argue are unlawful. In two paragraphs of summary analysis, the district court attempted to justify its sweeping injunction based on its view that the Act's unchallenged provisions "are unable to stand by themselves." App. 299. That assessment, however, is inconsistent with South Carolina law and the Act.

### 1. The Act's severability clause requires that every "word" not invalidated take effect.

Under South Carolina law, which governs the severability analysis, "[w]hen the residue of an Act, *sans* that portion found to be unconstitutional, is capable of being executed in accordance with the Legislative intent, independent of the rejected portion, the Act as a whole should not be stricken as being in violation of a Constitutional Provision." *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 301 (4th Cir. 2009) (quoting *Joytime Distribs. & Amusement Co. v. South Carolina*, 528 S.E.2d 647, 654 (S.C. 1999)). Courts "must be hesitant to declare any portion of a statute unconstitutional," and "only the unconstitutional part" should be invalidated "where to do so does not impair the remainder of the statute." *Joytime*, 528 S.E.2d at 655; *see also Stone v. Traynham*, 297 S.E.2d 420, 422 (S.C. 1982) ("The separation and independence of each branch of government require that we go no further than

41

absolutely necessary in declaring unconstitutional an action of the legislature.").

The central question is whether "the constitutional portion of the statute" "is of such a character that it may fairly be presumed that the legislature would have passed it independent of that which conflicts with the constitution." *Ex Post Facto Issues*, 561 F.3d at 301; *see also Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 437 (4th Cir. 2007).

Here, the Act's severability clause answers that question beyond any doubt: Yes.  The clause provides:

> If any section, subsection, paragraph, subparagraph, sentence, clause, phrase, or word of this act is for any reason held to be unconstitutional or invalid, then such holding shall not affect the constitutionality or validity of the remaining portions of this act, the General Assembly hereby declaring that it would have passed this act and each and every section, subsection, paragraph, subparagraph, sentence, clause, phrase, and word thereof, irrespective of the fact that any one or more other sections, subsections, paragraphs, subparagraphs, sentences, clauses, phrases, or words hereof may be declared to be unconstitutional, invalid, or otherwise ineffective.

Act § 7.  This provision is as clear an expression of legislative intent as can be found: Every single "word" not challenged must go into effect.  The South Carolina Supreme Court, interpreting a near-identical provision, has explained that such a severability clause "is strongly worded and evidences strong legislative intent that the several parts of [the act] be treated independently." *Joytime*, 528 S.E.2d at 654.

That rule follows from South Carolina's approach to statutory interpretation, which focuses on the text as "the best evidence of the legislative intent." *Smith v.*

*Tiffany*, 799 S.E.2d 479, 483 (S.C. 2017) (cleaned up). Under this "cardinal rule" of interpretation, "[w]here the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning." *Hodges v. Rainey*, 533 S.E.2d 578, 581 (S.C. 2000). Nothing about the Act's robust severability clause is ambiguous, so the analysis should end: everything that the Abortion Centers do not directly challenge (or cannot prevail on) must stand.

Consider, for example, the new § 44-41-630, which requires the abortionist to perform an ultrasound, give the mother the option to view her unborn child, and record a medical description of the images. If this section had been passed as a standalone bill, there is no question that it would be capable of being implemented. And the severability clause mandates that the courts treat this section, and all other similar unchallenged sections, just like that—as a standalone provision that survives any invalidation of another provision. That should be the end of the matter.

Any further (unnecessary) analysis only confirms the Act's text. For instance, the structure of the Act underscores the independence of its various provisions. *Cf. Joytime*, 528 S.E.2d at 655 (looking to structure). The regulation directly challenged by the Abortion Centers is codified in one statutory section (S.C. Code Ann. § 44-41-680), independent of the other provisions.

Moreover, the Act's other provisions logically stand apart from the single challenged provision. For instance, Section 4 of the Act adds certain information to the reporting requirements that the abortionist must submit to DHEC after he performs an abortion. The Abortion Centers challenge neither the preexisting requirements (which have been upheld by this Court, *Bryant*, 222 F.3d at 169–72) nor the Act's additional requirements, all of which can be implemented regardless of the challenged provision.

As another example, requiring the abortionist to give the mother the opportunity to see an ultrasound and hear her child's heartbeat advances legitimate state interests in the mother making informed irreversible decisions, regardless of whether the abortionist could then terminate the unborn child's life and the mother's pregnancy. As the Supreme Court has explained, "most women considering an abortion would deem the impact on the fetus relevant, if not dispositive, to the decision," and "[i]n attempting to ensure that a woman apprehend the full consequences of her decision, the State furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." *Casey*, 505 U.S. at 882.

In sum, even absent a severability clause, the district court's injunction would be obviously overbroad—and with a clause as clear as the Act's, it should not be a close call. This Court should not countenance such a judicial intrusion upon South

Carolina's legitimate sovereign interests in the form of an unnecessary nullification of state law. Therefore, at a minimum, the Court should vacate the district court's overbroad injunction of the Act.

### 2. U.S. Supreme Court precedent requires severance of any provision invalidated here.

A binding Supreme Court decision on all fours with this case—but ignored by the district court—rejected a severability argument much like the one made here by the Abortion Centers. In *Leavitt v. Jane L.*, the Court was confronted with two abortion regulations in the same statute with a severability clause similar to the Act's. 518 U.S. 137, 138–40 (1996) (per curiam). The Court of Appeals had refused to sever the regulations because, in its view, doing so "would clearly undermine the legislative purpose to ban most abortions." *Id.* at 143 (cleaned up). Relying on YouTube videos of individual legislators, the Abortion Centers here made the same argument: "the Six-Week Ban gives SB 1 its purpose." ECF No. 59, at 12.

The Supreme Court—which normally defers to federal courts of appeals on questions of state law—summarily reversed the court's decision as a "plainly wrong," "blatant federal-court nullification of state law." 518 U.S. at 145. The Court said there was "no need to resort to conjecture" about legislative intent, because the law included "a provision that could not be clearer in its message that the legislature would have passed every aspect of the law irrespective of the fact that any one or more provision be declared unconstitutional." *Id.* at 141 (cleaned up).

The Court likewise rejected the argument that the regulations were "interrelated," and thus could not be severed, emphasizing that the "relevant" question was whether they were "so interdependent that the remainder of the statute cannot function effectively without the invalidated provision." *Id.* Here, as in *Leavitt*, the unchallenged provisions of the Act are capable of operating separately, and the "statutory text" "explicitly states" that the courts must allow them to do so. *Id.* at 144.

Accordingly, courts confronting similar issues have followed the Supreme Court's admonishment to give effect to "statement[s] by the [State] Legislature of its own intent in enacting regulations of abortion," *id.* at 140, routinely severing and upholding disclosure and reporting requirements. *See, e.g.*, *Edwards v. Beck*, 8 F. Supp. 3d 1091, 1101 (E.D. Ark. 2014) (holding "that the remaining heartbeat testing and disclosure requirements are independently capable of furthering the stated purpose of" the law and must take effect *even absent* a severability clause), *aff'd*, 786 F.3d 1113 (8th Cir. 2015); *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 776 n.6 (8th Cir. 2015) (indicating that a statutory requirement that the abortionist "inform the pregnant woman whether her unborn child possesses a detectable heartbeat" would be severable from a fetal heartbeat law).

### 3. The district court erroneously imposed its own views of the Act's purposes.

Despite the Act's clear severability clause and analogous precedents, the district court carved its own path. The court did not question that the unchallenged

provisions are indeed "capable" of being executed in accord with the Act's express "intent," *Ex Post Facto Issues*, 561 F.3d at 301—namely, that every single "word" not challenged go into effect. Act § 7. Indeed, even the Abortion Centers never questioned that fact. Instead, the district court asserted that "[t]he only purpose of" "the mandatory ultrasound disclosure provision" "is to facilitate" the challenged regulation. App. 298–99. The district court did not explain how requiring an abortionist to give the mother the opportunity and option to view an ultrasound of her unborn child "facilitates" the challenged provision at all. In any event, as *Leavitt* demonstrates, the court's speculation—and attempt to substitute its assessment for the General Assembly's intent and the Act's text—is both incorrect and irrelevant.

Such ultrasound provisions have independent, valid purposes, as evidenced by the fact that similar provisions have been widely enacted and repeatedly upheld in court—which is presumably why the Abortion Centers here do not challenge the provision. "The information conveyed by an ultrasound image, its description, and the audible beating fetal heart gives a patient greater knowledge of the unborn life inside her." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 430 (6th Cir. 2019); *id.* at 432–34 (collecting similar cases); *cf. Casey*, 505 U.S. at 881–83, 900–01 (upholding informed consent, recordkeeping, and reporting provisions). "The State has an interest in ensuring so grave a choice is well informed," especially given that "some women come to regret their choice to abort the infant life they once

created and sustained." *Gonzales*, 550 U.S. at 159. Moreover, "[p]erforming an ultrasound allows an abortion doctor to get a clear picture of the woman's pregnancy—including the gestational age and size of the unborn child, whether there are twins, whether the heart is beating, and the orientation of the unborn child within the uterus—which allows the doctor to anticipate any likely complications." *Van Hollen*, 738 F.3d at 803 (Manion, J., concurring in part). Finally, ultrasounds "are viewed as 'medically necessary' for the mother" because they can reveal important information about her health. *Texas Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 579 (5th Cir. 2012). Underscoring the importance of ultrasounds to both fetal and maternal health, state regulations already require abortionists to conduct ultrasounds at 14 weeks and recommend ultrasounds at 12 weeks. S.C. Code Ann. Regs. 61-12.301.

More fundamentally, a federal court's speculation about the purposes of particular statutory provisions may not be substituted for the elected branches' judgment. It does not matter if the district court thought that giving mothers more information is a valid purpose (though it is), or even if it thought the provision advances that purpose (though it does). The only question is whether "it may fairly be presumed the legislature would have passed [the other provisions] independent of" the challenged one. *Joytime*, 528 S.E.2d at 654. According to the best evidence of legislative intent—the law itself—the answer is unquestionably yes. The plain text

of the Act shows that the People's representatives thought every single "word" had independent purpose and importance. Act § 7. The district court's departure from that text "usurps the constitutional allocation of the power to write a statute." *United States v. Under Seal*, 819 F.3d 715, 724 (4th Cir. 2016); *see Tiffany*, 799 S.E.2d at 488 ("We construe the statute in a manner to give effect to the policy decision made by the legislature."). Further, by enjoining unchallenged provisions of the Act, the district court necessarily, and needlessly, interfered with the General Assembly's command that the Act take effect immediately upon approval by the Governor. *See* Act § 9; *cf.* S.C. Const. art. IV, § 15.

As to the other provisions in Section 3 of the Act, the district court stated that "they are also so intertwined" with the ultrasound provision and challenged regulation "as to preclude severability." App. 299. As an initial matter, the ultrasound provision is irrelevant to the question of whether other provisions are severable, because it was not challenged and, as just shown, is capable of being executed independently. Severability is not dominoes. And neither the district court nor the Abortion Centers have explained *why* the other provisions are "so intertwined" that the federal courts can substitute their judgment for that of the General Assembly. Why can't the requirement to give a mother the chance to hear her unborn child's heartbeat operate independently of the challenged provision? How have similar requirements in many other States worked perfectly well? Why can't the cause of action

for women who have been unlawfully deprived of relevant information operate independently? These questions were posed below, yet one searches the Abortion Centers' filings and district court's orders in vain for any answers.

The district court went farther still, also redlining the Act's reporting and disclosure requirements in Sections 4, 5, and 6 because they "contain language that references the words 'fetal heartbeat' as it is defined in" the Act or other references to Section 3. App. 299. But the Abortion Centers do not challenge that definition or the other references, and they certainly could not prevail as to any such challenge. And again, neither the Centers nor the district court suggested that the disclosure and reporting requirements in Sections 4, 5, and 6 are somehow *incapable* of being executed independently (as the General Assembly commanded), much less identified any infirmity with the substance of the requirements—which have been previously upheld by this Court. *See Bryant*, 222 F.3d at 169–75. Even in the context of a provision that "must be understood by reference to an inoperative portion of the statute"—which is not the case here—such a provision "is capable of functioning independently as a fully operative law." *Ameur*, 759 F.3d at 330 (cleaned up); *see also Leavitt*, 518 U.S. at 142 (similar).

In sum, the district court's injunction improperly redlines and unnecessarily enjoins many provisions of the Act not directly challenged by the Abortion Centers and that are, by legislative command, independent from the regulation that they do

challenge.  Any relief cannot extend to these provisions.  Otherwise, unelected judges "nullify more of the work of the people's elected representatives than is constitutionally necessary"—or appropriate.  *Covenant Media*, 493 F.3d at 438.  The federal courts do not have the power to rewrite state law.  The overbroad injunction should be vacated.

**B.    The Abortion Centers did not satisfy the other injunction requirements regarding the Act's unchallenged provisions.**

Even if the Abortion Centers had shown a clear likelihood of success in their effort to invalidate the entire Act, they must demonstrate and the district court must "separately consider" whether they are "likely to suffer irreparable harm in the absence of preliminary relief," whether "the balance of equities tips in [their] favor," and whether "an injunction is in the public interest."  *Di Biase*, 872 F.3d at 230 (cleaned up).  Despite the Abortion Centers' burden to satisfy all four preliminary injunction factors, they never discussed them in the context of the unchallenged provisions, and the district court made no findings about them.  This failure alone was error.  *See* Fed. R. Civ. P. 52(a)(2) ("In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action.").

In all events, the Abortion Centers could not satisfy the other factors.  The potential time and expense to the Abortion Centers of giving mothers adequate information to make informed decisions is not an irreparable harm.  *See Di Biase*, 872

F.3d at 230.  Mothers are *helped* by receiving that information.  *Casey*, 505 U.S. at 882.  Giving mothers adequate information also promotes the State's legitimate interests in protecting and preserving human life and maternal health.  *See id.*; *EMW*, 920 F.3d at 430 ("That this information might persuade a woman to change her mind does not render it suspect . . . .  It just means that it is pertinent to her decision-making.").  And "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up).

Because the Abortion Centers did not demonstrate the prerequisites for a preliminary injunction against the unchallenged provisions, the Court should vacate the injunction.  *See CPC*, 214 F.3d at 461 (explaining that any injunction "must be tailored as precisely as possible" (cleaned up)).

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's preliminary injunction and remand the case for dismissal.  At a minimum, the Court should vacate the district court's overbroad injunction of the Act and unchallenged provisions of South Carolina law.

Respectfully submitted,

s/ Christopher Mills

THOMAS A. LIMEHOUSE, JR.          CHRISTOPHER MILLS
WM. GRAYSON LAMBERT               *Spero Law LLC*
*Office of the Governor*          *1050 Johnnie Dodds Blvd. #83*
*South Carolina State House*      *Mt. Pleasant, SC 29465*
*1100 Gervais Street*             *(843) 606-0640*
*Columbia, South Carolina 29201*  *cmills@spero.law*
*(803) 734-2100*

*Counsel for Governor McMaster*

ALAN WILSON                       KEVIN A. HALL
ROBERT D. COOK                    M. TODD CARROLL
J. EMORY SMITH, JR.               *Womble Bond Dickinson (US) LLP*
*Office of the Attorney General*  *1221 Main Street, Suite 1600*
*P.O. Box 11549*                  *Columbia, South Carolina 29201*
*Columbia, South Carolina 29211*  *(803) 454-6504*
*(803) 734-3677*

*Counsel for Attorney General*    *Counsel for Speaker Lucas*
*Wilson and Solicitor Wilkins*

JULY 7, 2021

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(b) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 12,949 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated: July 7, 2021

/s Christopher Mills
Christopher Mills

## CERTIFICATE OF SERVICE

I, Christopher Mills, an attorney, certify that on this day the foregoing Brief was served electronically on all parties via CM/ECF.

Dated: July 7, 2021

<u>s/ Christopher Mills</u>
Christopher Mills

**ADDENDUM**

# STATUTORY PROVISIONS

**2021 S.C. Acts No. 1, South Carolina Fetal Heartbeat and Protection from Abortion Act**

AN ACT TO AMEND THE CODE OF LAWS OF SOUTH CAROLINA, 1976, TO ENACT THE "SOUTH CAROLINA FETAL HEARTBEAT AND PROTECTION FROM ABORTION ACT" BY ADDING ARTICLE 6 TO CHAPTER 41, TITLE 44 SO AS TO REQUIRE TESTING FOR A DETECTABLE FETAL HEART-BEAT BEFORE AN ABORTION IS PERFORMED ON A PREGNANT WOMAN, TO PROHIBIT THE PERFORMANCE OF AN ABORTION IF A FETAL HEARTBEAT IS DETECTED, TO PROVIDE MEDICAL EMERGENCY  AND OTHER EXCEPTIONS, TO REQUIRE CERTAIN DOCUMENTATION AND RECORDKEEPING BY PHYSICIANS PERFORMING ABORTIONS,  TO RE-QUIRE PHYSICIANS TO NOTIFY LAW ENFORCEMENT AFTER PERFORM-ING AN ABORTION IN CERTAIN CIRCUMSTANCES, TO CREATE A CIVIL ACTION FOR A PREGNANT WOMAN UPON WHOM AN ABORTION IS PER-FORMED, TO CREATE CRIMINAL PENALTIES, AND FOR OTHER PUR-POSES; TO AMEND SECTION 44-41-460, RELATING TO THE REQUIRED REPORTING OF ABORTION DATA TO THE DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL, SO AS TO ADD REPORTING OF FE-TAL HEARTBEAT TESTING AND PATIENT MEDICAL CONDITION DATA; TO AMEND SECTION 44-41-330, RELATING TO A PREGNANT WOMAN'S RIGHT TO KNOW CERTAIN PREGNANCY INFORMATION, SO AS TO RE-QUIRE NOTIFICATION OF THE DETECTION OF A FETAL HEARTBEAT; AND TO AMEND SECTION 44-41-60, RELATING TO ABORTION REPORT-ING REQUIREMENTS, SO AS TO ADD REPORTING REQUIREMENTS.

Be it enacted by the General Assembly of the State of South Carolina:

**Citation**

SECTION 1. This act shall be known and may be cited as the "South Carolina Fetal Heartbeat and Protection from Abortion Act".

**Findings**

SECTION 2. The General Assembly hereby finds, according to contemporary medical research, all of the following:

>     (1)     as many as thirty percent of natural pregnancies end in spontaneous miscarriage;

(2)     fewer than five percent of all natural pregnancies end in spontaneous miscarriage after the detection of a fetal heartbeat;

(3)     over ninety percent of in vitro pregnancies survive the first trimester if a fetal heartbeat is detected;

(4)     nearly ninety percent of in vitro pregnancies do not survive the first trimester if a fetal heartbeat is not detected;

(5)     a fetal heartbeat is a key medical predictor that an unborn human individual will reach live birth;

(6)     a fetal heartbeat begins at a biologically identifiable moment in time, normally when the fetal heart is formed in the gestational sac;

(7)     the State of South Carolina has legitimate interests from the outset of a pregnancy in protecting the health of the pregnant woman and the life of the unborn child who may be born; and

(8)     in order to make an informed choice about whether to continue a pregnancy, a pregnant woman has a legitimate interest in knowing the likelihood of the human fetus surviving to full-term birth based upon the presence of a fetal heartbeat.

**Fetal Heartbeat and Protection from Abortion Act**

SECTION 3. Chapter 41, Title 44 of the 1976 Code is amended by adding:

"Article 6

Fetal Heartbeat and Protection from Abortion

Section 44-41-610. As used in this article:

(1)     'Conception' means fertilization.

(2)     'Contraceptive' means a drug, device, or chemical that prevents conception.

(3)     'Fetal heartbeat' means cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac.

(4)     'Gestational age' means the age of an unborn human individual as calculated from the first day of the last menstrual period of a pregnant woman.

(5)     'Gestational sac' means the structure that comprises the extraembryonic membranes that envelop the human fetus and that is typically visible by ultrasound after the fourth week of pregnancy.

(6)     'Human fetus' or 'unborn child' each means an individual organism of the species homo sapiens from fertilization until live birth.

(7)     'Intrauterine pregnancy' means a pregnancy in which a human fetus is attached to the placenta within the uterus of a pregnant woman.

(8)     'Medical emergency' means a condition that, by any reasonable medical judgment, so complicates the medical condition of a pregnant woman that it necessitates the immediate abortion of her pregnancy to avert her death without first determining whether there is a detectable fetal heartbeat or for which the delay necessary to determine whether there is a detectable fetal heartbeat will create serious risk of a substantial and irreversible physical impairment of a major bodily function, not including psychological or emotional conditions. A condition must not be considered a medical emergency if based on a claim or diagnosis that a woman will engage in conduct that she intends to result in her death or in a substantial and irreversible physical impairment of a major bodily function.

(9)     'Physician' means any person licensed to practice medicine and surgery, or osteopathic medicine and surgery, in this State.

(10)   'Reasonable medical judgment' means a medical judgment that would be made by a reasonably prudent physician who is knowledgeable about the case and the treatment possibilities with respect to the medical conditions involved.

(11)   'Spontaneous miscarriage' means the natural or accidental termination of a pregnancy and the expulsion of the human fetus, typically caused by genetic defects in the human fetus or physical abnormalities in the pregnant woman.

Section 44-41-620. (A)   A court judgment or order suspending enforcement of any provision of this chapter is not to be regarded as tantamount to repeal of that provision.

(B)     If the United States Supreme Court issues a decision overruling Roe v. Wade, 410 U.S. 113 (1973), any other court issues an order or judgment restoring, expanding, or clarifying the authority of states to prohibit or regulate abortion entirely or in part, or an amendment is ratified to the Constitution of the United States restoring, expanding, or clarifying the authority of states to prohibit or regulate

abortion entirely or in part, then the Attorney General may apply to the pertinent state or federal court for either or both of the following:

(1)     a declaration that any one or more of the statutory provisions specified in subsection (A) are constitutional; or

(2)     a judgment or order lifting an injunction against the enforcement of any one or more of the statutory provisions specified in subsection (A).

(C)     If the Attorney General fails to apply for relief pursuant to subsection (B) within a thirty-day period after an event described in that subsection occurs, then any solicitor may apply to the appropriate state or federal court for such relief.

Section 44-41-630. An abortion provider who is to perform or induce an abortion, a certified technician, or another agent of the abortion provider who is competent in ultrasonography shall:

(1)     perform an obstetric ultrasound on the pregnant woman, using which-ever method the physician and pregnant woman agree is best under the circum-stances;

(2)     during the performance of the ultrasound, display the ultrasound images so that the pregnant woman may view the images; and

(3)     record a written medical description of the ultrasound images of the unborn child's fetal heartbeat, if present and viewable.

Section 44-41-640. If a pregnancy is at least eight weeks after fertilization, then the abortion provider who is to perform or induce an abortion, or an agent of the abortion provider, shall tell the woman that it may be possible to make the embryonic or fetal heartbeat of the unborn child audible for the pregnant woman to hear and shall ask the woman if she would like to hear the heartbeat. If the woman would like to hear the heartbeat, then the abortion provider shall, using whichever method the physician and patient agree is best under the circumstances, make the fetal heartbeat of the unborn child audible for the pregnant woman to hear.

Section 44-41-650. (A)    Except as provided in Section 44-41-660, no person shall perform, induce, or attempt to perform or induce an abortion on a pregnant woman before a physician determines in accordance with Section 44-41-630 whether the human fetus the pregnant woman is carrying has a detectable fetal heartbeat.

(B)     A person who violates subsection (A) is guilty of a felony and, upon conviction, must be fined ten thousand dollars, imprisoned not more than two years, or both.

Section 44-41-660. (A)    Section 44-41-650 does not apply to a physician who performs or induces an abortion if the physician determines according to standard medical practice that a medical emergency exists that prevents compliance with the section.

(B)     A physician who performs or induces an abortion on a pregnant woman based on the exception in subsection (A) shall make written notations in the pregnant woman's medical records of the following:

(1)     the physician's belief that a medical emergency necessitating the abortion existed;

(2)     the medical condition of the pregnant woman that assertedly prevented compliance with Section 44-41-650; and

(3)     the medical rationale to support the physician's conclusion that the pregnant woman's medical condition necessitated the immediate abortion of her pregnancy to avert her death.

(C)     For at least seven years from the date the notations are made, the physician shall maintain in his own records a copy of the notations.

Section 44-41-670. A physician is not in violation of Section 44-41-650 if the physician acts in accordance with Section 44-41-630 and the method used to test for the presence of a fetal heartbeat does not reveal a fetal heartbeat.

Section 44-41-680. (A)    Except as provided in subsection (B), no person shall perform, induce, or attempt to perform or induce an abortion on a pregnant woman with the specific intent of causing or abetting the termination of the life of the human fetus the pregnant woman is carrying and whose fetal heartbeat has been detected in accordance with Section 44-41-630.

(B)     A physician may perform, induce, or attempt to perform or induce an abortion on a pregnant woman after a fetal heartbeat has been detected in accordance with Section 44-41-630 only if:

(1)     the pregnancy is the result of rape, and the probable post-fertilization age of the fetus is fewer than twenty weeks;

(2)    the pregnancy is the result of incest, and the probable post-fertilization age of the fetus is fewer than twenty weeks;

(3)    the physician is acting in accordance with Section 44-41-690; or

(4)    there exists a fetal anomaly, as defined in Section 44-41-430.

(C)    A physician who performs or induces an abortion on a pregnant woman based on the exception in either subsection (B)(1) or (2) must report the allegation of rape or incest to the sheriff in the county in which the abortion was performed. The report must be made no later than twenty-four hours after performing or inducing the abortion, may be made orally or otherwise, and shall include the name and contact information of the pregnant woman making the allegation. Prior to performing or inducing an abortion, a physician who performs or induces an abortion based upon an allegation of rape or incest must notify the pregnant woman that the physician will report the allegation of rape or incest to the sheriff. The physician shall make written notations in the pregnant woman's medical records that the abortion was performed pursuant to the applicable exception, that the doctor timely notified the sheriff of the allegation of rape or incest, and that the woman was notified prior to the abortion that the physician would notify the sheriff of the allegation of rape or incest.

(D)    A person who violates subsection (A) is guilty of a felony and, upon conviction, must be fined ten thousand dollars, imprisoned not more than two years, or both.

Section 44-41-690. (A)    Section 44-41-680 does not apply to a physician who performs a medical procedure that, by any reasonable medical judgment, is designed or intended to prevent the death of the pregnant woman or to prevent the serious risk of a substantial and irreversible impairment of a major bodily function of the pregnant woman.

(B)    A physician who performs a medical procedure as described in subsection (A) shall declare, in a written document, that the medical procedure was necessary, by reasonable medical judgment, to prevent the death of the pregnant woman or to prevent the serious risk of a substantial and irreversible physical impairment of a major bodily function of the pregnant woman. In the document, the physician shall specify the pregnant woman's medical condition that the medical procedure was asserted to address and the medical rationale for the physician's conclusion that the medical procedure was necessary to prevent the death of the pregnant woman or to

prevent the serious risk of a substantial and irreversible impairment of a major bodily function of the pregnant woman.

(C)    A physician who performs a medical procedure as described in subsection (A) shall place the written document required by subsection (B) in the pregnant woman's medical records. For at least seven years from the date the document is created, the physician shall maintain a copy of the document in his own records.

Section 44-41-700. A physician is not in violation of Section 44-41-680 if the physician acts in accordance with Section 44-41-630 and the method used to test for the presence of a fetal heartbeat does not reveal a fetal heartbeat.

Section 44-41-710. This article must not be construed to repeal, by implication or otherwise, Section 44-41-20 or any otherwise applicable provision of South Carolina law regulating or restricting abortion. An abortion that complies with this article but violates the provisions of Section 44-41-20 or any otherwise applicable provision of South Carolina law must be considered unlawful as provided in such provision. An abortion that complies with the provisions of Section 44-41-20 or any otherwise applicable provision of South Carolina law regulating or restricting abortion but violates this article must be considered unlawful as provided in this article. If some or all of the provisions of this article are ever temporarily or permanently restrained or enjoined by judicial order, all other provisions of South Carolina law regulating or restricting abortion must be enforced as though such restrained or enjoined provisions had not been adopted; provided, however, that whenever such temporary or permanent restraining order or injunction is stayed or dissolved, or otherwise ceases to have effect, such provisions shall have full force and effect.

Section 44-41-720. Nothing in this article prohibits the sale, use, prescription, or administration of a drug, device, or chemical that is designed for contraceptive purposes.

Section 44-41-730. A pregnant woman on whom an abortion is performed or induced in violation of this article may not be criminally prosecuted for violating any of the provisions of this article or for attempting to commit, conspiring to commit, or acting complicitly in committing a violation of any of the provisions of the article and is not subject to a civil or criminal penalty based on the abortion being performed or induced in violation of any of the provisions of this article.

Section 44-41-740. (A)    A woman who meets any one or more of the following criteria may file a civil action in a court of competent jurisdiction:

(1)    a woman on whom an abortion was performed or induced in violation of this article; or

(2)    a woman on whom an abortion was performed or induced who was not given the information provided in Section 44-41-330.

(B)    A woman who prevails in an action filed pursuant to subsection (A) shall receive the following from the person who committed the act or acts described in subsection (A):

(1)    damages in an amount equal to ten thousand dollars or an amount determined by the trier of fact after consideration of the evidence; and

(2)    court costs and reasonable attorney's fees.

(C)    If the defendant in an action filed pursuant to subsection (A) prevails and the court finds that the commencement of the action constitutes frivolous conduct and that the defendant was adversely affected by the frivolous conduct, then the court shall award reasonable attorney's fees to the defendant; provided, however, that a conclusion of frivolousness cannot rest upon the unconstitutionality of the provision that was allegedly violated."

**Abortion reporting requirements, Pain-Capable Unborn Child Protection Act**

SECTION 4. Section 44-41-460(A) of the 1976 Code is amended by adding appropriately numbered new items at the end to read:

"(    )    The information related to fetal heartbeat testing required pursuant to Sections 44-41-630, 44-41-660, and 44-41-690, as applicable.

(    )    Whether the reason for the abortion was to preserve the health of the pregnant woman and, if so, the medical condition that the abortion was asserted to address and the medical rationale for the conclusion that an abortion was necessary to address that condition. If the reason for the abortion was other than to preserve the health of the pregnant woman, then the report must specify that maternal health was not the purpose of the abortion. This information must also be placed in the pregnant woman's medical records and maintained for at least seven years thereafter."

**Fetal heartbeat determination, Woman's Right to Know Act**

SECTION 5. Section 44-41-330(A)(1) of the 1976 Code is amended to read:

"(1)(a)    The woman must be informed by the physician who is to perform the abortion or by an allied health professional working in conjunction with the physician of the procedure to be involved and by the physician who is to perform the abortion of the probable gestational age of the embryo or fetus at the time the abortion is to be performed. If an ultrasound is performed, an abortion may not be performed sooner than sixty minutes following completion of the ultrasound. The physician who is to perform the abortion or an allied health professional working in conjunction with the physician must inform the woman before the ultrasound procedure of her right to view the ultrasound image at her request during or after the ultrasound procedure.

(b)    If the physician who intends to perform or induce an abortion on a pregnant woman has determined pursuant to Section 44-41-630 that the human fetus the pregnant woman is carrying has a detectable fetal heartbeat, then that physician shall inform the pregnant woman in writing that the human fetus the pregnant woman is carrying has a fetal heartbeat. The physician shall further inform the pregnant woman, to the best of the physician's knowledge, of the statistical probability, absent an induced abortion, of bringing the human fetus possessing a detectable fetal heartbeat to term based on the gestational age of the human fetus or, if the director of the department has specified statistical probability information, shall provide to the pregnant woman that information. The department may promulgate regulations that specify information regarding the statistical probability of bringing an unborn child possessing a detectable fetal heartbeat to term based on the gestational age of the unborn child. Any regulations must be based on available medical evidence."

**Abortion reporting requirements**

SECTION 6. Section 44-41-60 of the 1976 Code is amended to read:

"Section 44-41-60. Any abortion performed in this State must be reported by the performing physician on the standard form for reporting abortions to the State Registrar, Department of Health and Environmental Control, within seven days after the abortion is performed. The names of the patient and physician may not be reported on the form or otherwise disclosed to the State Registrar. The form must indicate from whom consent was obtained, circumstances waiving consent, and, if an exception was exercised pursuant to Section 44-41-660, which exception the physician relied upon in performing or inducing the abortion."

## Severability clause

SECTION 7. If any section, subsection, paragraph, subparagraph, sentence, clause, phrase, or word of this act is for any reason held to be unconstitutional or invalid, then such holding shall not affect the constitutionality or validity of the remaining portions of this act, the General Assembly hereby declaring that it would have passed this act and each and every section, subsection, paragraph, subparagraph, sentence, clause, phrase, and word thereof, irrespective of the fact that any one or more other sections, subsections, paragraphs, subparagraphs, sentences, clauses, phrases, or words hereof may be declared to be unconstitutional, invalid, or otherwise ineffective.

## Savings clause

SECTION 8. The repeal or amendment by this act of any law, whether temporary, permanent, civil, or criminal, does not affect pending actions, rights, duties, or liabilities founded thereon or alter, discharge, release, or extinguish any penalty, forfeiture, or liability incurred under the repealed or amended law, unless the repealed or amended provision shall so expressly provide. After the effective date of this act, all laws repealed or amended by this act must be taken and treated as remaining in full force and effect for the purpose of sustaining any pending or vested right, civil action, special proceeding, criminal prosecution, or appeal existing as of the effective date of this act and for the enforcement of rights, duties, penalties, forfeitures, and liabilities as they stood under the repealed or amended laws.

## Time effective

SECTION 9. This act takes effect upon approval by the Governor.

Ratified the 18th day of February, 2021.

Approved the 18th day of February, 2021.